SAMUEL W. HOYT *v.* EDGAR S. HOYT, *et al.*

October Term, 1904.

Present:   ROWELL, C. J., TYLER, MUNSON, START, WATSON, HASELTON, and POWERS, JJ.

Opinion filed February 6, 1905.

*Trusts—Devise to Support Parents—Breach of Condition— Remedy—Release — Reformation of Instruments — Mistake—Set-off.*

When the scrivner who drew a quitclaim deed, and the party who executed it, intended thereby to only effect the assignment of a lease, and the scrivner did not know that the assignor had a claim upon the demised premises for support, which was independent of the lease, and by mistake used words operative to convey all the assignor's interest in the land, such quitclaim deed will be construed to have conveyed only the assignor's interest in the lease intended to be thereby assigned.

A beneficiary under a will, who is entitled to a life support out of property devised to his son, on condition that the latter shall afford him such support, cannot convey away his right of support.

Land was devised to a son on condition that he should support his parents during their lives. The son leased this land to his father, who lived upon it, and assumed to furnish support for himself and his wife, engaging with grocers and others to furnish family supplies, and voluntarily paying therefor, saying nothing to his son upon the subject. During this time the son worked as a hired man upon the property, receiving wages from his father, and pay-

ing or promising to pay his father for his board. *Held*, that the son was released during the continuance of that arrangement, from furnishing the support prescribed by the will.

A son to whom land is devised, on condition that he should support his parents during their lives, holds the estate devised in trust for the life support of his father and mother, though no express trust is created by the will.

When property was devised to a son, on condition that he should support his parents during their lives, and he fails to do so, a bill in equity by the parents to foreclose the son's interest in the property is a proper remedy.

A son, who accepts a devise conditioned on his furnishing support for his parents during their lives, is not relieved from that obligation by the existence of an indebtedness from his father to him, and cannot set off such indebtedness against the amount due from him to his father for such support.

APPEAL IN CHANCERY. Heard on bill, answer, and master's report, at the September Term, 1903, Chittenden County, *Tyler*, Chancellor. Decree, *pro forma*, for the orator. The defendant appealed.

*L. F. Wilbur, H. F. Wolcott* and *Elihu B. Taft* for the orator.

The quitclaim deed was designed to effect a mere assignment of the lease and its effect should be so limited. *Beardsley* v. *Knight*, 10 Vt. 185; *Dietrich* v. *Hutchinson*, 73 Vt. 141; *Adams* v. *Stevens*, 49 Me. 362; *Lockwood* v. *White*, 65 Vt. 466.

*W. Y. Leary* and *V. A. Bullard* for the defendant.

The lease of the farm by the son to his father merged the trust interest in a new estate. 50 Am. Dec. 183; 91 Ky. 601; 30 Mo. 199; 86 Va. 668.

TYLER, J. The orator brought this bill to foreclose the interest of the defendant Edgar S. Hoyt in a farm in Jericho

by reason of his neglect and refusal to support the orator and his wife, Emily E. Hoyt, and as incident to the foreclosure, to have two written instruments reformed.

The master finds that a Mrs. Borrowdale owned the farm in her life-time, and that by her will, which was duly proved and established in August, 1896, she devised the use of the farm and of the personal property thereon to Edgar during his life, and upon his decease to his heirs, on condition that he should support his father and mother during their lives and the life of the survivor of them, and made such support a charge upon the farm; that the orator in August, 1896, under an arrangement with the executor of Mrs. Borrowdale's will, moved with his family, consisting of his wife, the defendant Edgar, then twenty or twenty-one years of age, and a younger son, from Hillsboro, Wisconsin, to the farm in question and residing there as a family until the next March when the executor turned the farm and personal property over to Edgar; that Edgar carried on the farm till August, 1897, when he leased it to the orator for ten years and received from him $1,326.90 as the rent therefor in advance. The orator had an equitable interest in another farm owned by Mrs. Borrowdale in her life-time in Hillsboro and had made a claim against her estate, to settle which Edgar had given two notes amounting to $1,326.90 which his father surrendered to him for the rent of the Jericho farm. The orator entered into possession of the farm and personal property and in November, 1898, assigned the lease by quit claim deed, through one Gibson, to his wife Emily. The orator and his wife resided upon the farm under the lease until after the wife's death in July, 1900, and thereafter until he was deprived of it in January, 1901, by Edgar, who then turned him out and took possession himself. The orator's reason for assigning the lease to his wife was that he was in poor health,

had fear that he might die suddenly and that by the assign-
ment he thought that his wife would be better protected in
respect to her interest in the farm than if he retained it. The
assignment was made by a quit claim deed to Gibson, who by
a like deed assigned it to Emily, the orator acting for her as
her agent in the transaction.

The defendant claims that the orator conveyed his inter-
est in the lease and also his claim upon the land for his
support. The master finds that the orator, and Gibson, and
Mr. Wilbur who · drew the papers, only intended an assign-
ment of the lease, and that Wilbur had no knowledge that
the orator had any claim upon the farm for his support nor
that he had any right to support under said will; that Wilbur
was directed to draw an assignment of the lease and that
wholly through his mistake he used words operative to con-
vey all the orator's interest in or claim upon the land.

Upon these findings the quit claim deed must be construed
to have conveyed to the orator's wife only a lease-hold interest
in the farm. Vt. Dig., page 459, title, Mistake.

By settled rules of law the orator could not have conveyed
away his right to support. In *Barnes* v. *Dow*, 59 Vt. 530,
10 Atl. 258, it was held that a beneficiary under a will who
is entitled to a life support out of an estate held by a trustee
had no power to mortgage the estate; that "there was an
unmistakable intention of a permanent indefeasible provision
for a life support, and the object of the gift to * * * * was
such as to exclude the idea of alienation on her part. A life
support must be as lasting and continuing as life." See ~~Pom.~~ *Perry*
on Trusts, 3 Ed. § 386.

The orator was a nephew of Mrs. Borrowdale and has
deceased since the hearing before the master; Elihu B. Taft
has been appointed administrator of his estate and has en-
tered to prosecute the suit.

The master finds that when the orator and his family moved upon the farm in question he had but little means of support and that Edgar was also without means besides his wages. He boarded in his father's family, worked on the farm and used the products in part payment for his work. The orator and his wife were furnished support to the extent of the produce used by them from the farm. The rest of the support was furnished and paid for by the orator from his pension money and such other money as he possessed.

Upon the orator's request the master found that from August 28, 1896, when the orator moved to this farm, to August 2, 1897, when the lease was executed, a period of forty-eight and three-sevenths weeks, the support of the orator and his wife, as contemplated by the will, was fairly worth six dollars a week, $290.58; that from the latter date to the death of Emily, July 25, 1900, one hundred fifty-four and five-sevenths weeks, such support was worth six dollars a week, $928.30.

After the orator's assignment of the lease to his wife he managed the farm as her agent and provided for her and himself as he had done before, and down to the time of his wife's decease paid Edgar for the work done by him upon the farm.

From his wife's death until he went to Wisconsin, January 18, 1901, a period of twenty-five and two-sevenths weeks, it is found that the orator's support was reasonably worth three dollars a week, in all $75.80; that Edgar worked on the farm the remainder of the season, but for himself during the winter; that he married in August 1897, and resided, with his wife in a house away from the farm while he worked thereon, but that in the winter of 1898 and 1899 they moved to the farm and occupied certain rooms in the house while

the orator occupied other rooms; but they used the kitchen and dining-room in common and all took their meals at one table.

The relations between the orator and Edgar and his wife were very unfriendly after January 5, 1901. Edgar had told his father that he had no right there and had given him notice that he would "sue him out" unless he left the farm before a certain day.

On the orator's return from Wisconsin in April, 1901, he thought it unsafe to return to the farm and boarded at another place paying his board from his pension money. In May of that year he demanded money of Edgar for his support, which the latter refused, but told him he might have his support if he would return to the farm, to which the orator replied that he could not live there and that he wanted his support elsewhere. Edgar said he could not support him elsewhere. The orator then said if Edgar would put in writing that he and his wife would use him well and not kill him he would return. Edgar refused to give such a writing. For this period of sixty-seven and three-sevenths weeks the master finds that the orator's support was worth three dollars a week, $202.29.

It is found that prior to May 30, 1901, the orator made no demand of his son for support; that the latter never offered to furnish it and that there was no waiver of the provision in the will. The master was unable to find, though requested, whether or not the orator expected to be supported by Edgar.

In the years 1897 and 1898 Edgar sold large quantities of timber from the two lots of land that comprise the farm, so that the reversionary estate was injured to the amount of $1,500.00. These sales were mainly made after the lease was assigned by the orator to his wife; the proceeds were applied by Edgar in payment of his wages and in support of

himself and his wife, and it is found that he required all his wages for such support.

The orator claimed a homestead in the leased premises and rental therefor from January 19, 1901, to August 4, 1902, but from the report he had no such interest. The improvements made by him were made voluntarily and without Edgar's request, and for anything that appears, without any expectation by either party that the orator was to receive pay for them. Nor is there any ground for the allowance of the small items claimed, as keeping cows, use of horses, etc.

In the winter of 1897 and 1898 Edgar sold timber from a wood lot belonging to the farm, which the master finds injured the reversionary interest to the amount of $1,000.00; that in the winter of 1901 and 1902 he sold timber from the home farm which injured it to the amount of $500.00, and that Edgar applied the proceeds of this sale in part payment of his wages and to the support of himself and wife.

The defendant presented a claim of $1,500.00 for damages to the farm by the orator's bad husbandry, $400.00 for the defendant's labor, $250.00 for a note and $570.00 for cattle owned by the defendant and sold by the orator. It is found that this claim for damages to the farm was presented by the defendant to the commissioners upon Emily's estate, who allowed $250.00 thereon; that the defendant took no appeal from that judgment, and never made any claim for wages other than what were paid to him until he brought a suit against the orator in January, 1901, in which he recovered a judgment for $45.00, which the master assumes included all his claim for labor to that date. It is also found that the defendant's item for cattle sold was adjusted by the orator's giving him his note for $250.00 secured by a chattel mortgage.

When the orator moved to the farm it was apparently a valuable one but of a kind of soil that required considerable fertilizing. The lease included eighteen cows, all of which were unsuitable for dairy purposes, and the orator disposed of them with Edgar's knowledge, but with an intention to replace them by others according to a requirement in the lease. This however was not done; the hay was sold from the farm, and in November, 1898, the orator settled with the defendant for the cows, and gave him the note and chattel mortgage above mentioned.

The master found that the farm depreciated in value between August, 1897, and January, 1901, to the amount of $1,000.00, caused by selling the crops, a general lack of good husbandry, and from the natural decay of the buildings. He also finds that Edgar worked upon the farm most of the time and knew how it was managed. In 1901 Edgar rented the premises of the administrator of his mother's estate.

The defendant Edgar was about twenty years old when the will was made and proved, and he had no means of supporting his father and mother besides what the farm would furnish, so it is presumable that it was not contemplated by the testatrix that such support should be furnished elsewhere than upon the farm and from its products. From September 2, 1896, when the orator moved to the farm with his family, under an arrangement with the executor, who informed Edgar and his father of the provisions of the will, down to March 14, 1897, when the executor formally turned the farm and personal property over to Edgar, the provisions of the will were evidently carried out. On March 15, 1897, the ten years' lease was executed as a means, as is fairly inferable, though not expressly found, of providing the orator and his wife with support during that period.

The master states that the orator was without means of support to any extent. Yet he had a pension, the amount of which does not appear, and in 1897 he received $1,000.00 from the sale of a half interest in a farm that his daughter had devised to him. Soon after he moved to the farm in question he made arrangements with grocers and others to furnish supplies for his family, and afterwards paid about $500.00 for such supplies and made no request of Edgar either to furnish or pay for them.

During the period in dispute Edgar was a hired man upon the farm most of the time, receiving wages from his father, and down to the time of his marriage paying or promising to pay his father for his board. There is nothing in the report to show that the orator and his wife were not supported upon the farm to their satisfaction and to the satisfaction of the orator after his wife's decease, down to January, 1901, when Edgar turned his father out-doors and denied that he had any right upon the premises.

But whether or not the lease from Edgar to his father of the farm, stock, and other personal property thereon was intended by the parties as the means of supporting the orator and his wife in compliance with the will, it is certain that Edgar thereby, with the consent of his parents, put it out of his power to support them from the farm during the continuance of the lease.

The case clearly shows that while there was no express waiver by the orator of the provision in the will for the support of himself and his wife, he assumed to furnish such support himself and relieve his son from furnishing it. His engagements with grocers and others to furnish family supplies and his subsequent voluntary payment therefor, saying nothing to his son upon the subject, the manner in which he carried on the farm and supported himself and wife must be

considered as a voluntary release of his son from his obligation under the will.

Although contracts or agreements between trustees and their *cestui qui trusts* are looked upon with suspicion by courts, it is held that a *cestui qui trust* may release a breach of a trust by giving to the trustee a formal release or a formal confirmation of the transaction; also that he may be debarred from relief by long acquiesence in a breach of the trust, though he did not originally concur in it.   Perry on Trusts, 850, 851.

Upon the facts found the case falls within the rule relating to voluntary payments; that when a party pays money which he is under no legal obligation to pay, with full knowledge of the facts, he cannot recover it back.   *Taggart* v. *Rice,* 37 Vt. 47; *Burnham* v. *Strafford,* 53 Vt. 610.

This case is similar to *Barnes* v. *Dow,* 59 Vt. 530, 10 Atl. 258, in its essential facts, and the rules of law that were applied in that case are applicable here.   It was clearly the intention of Mrs. Borrowdale to provide a life support for her nephew and his father and mother out of the property devised.   In *Barnes* v. *Dow* the testator secured the support for his sister by a devise of his estate to his executor in trust, and the remainder to the executor's nephew.   It was there held that the devise created an active trust in the executor for the sister's support during her life, and that at her death the trust would terminate and the remainder vest in the nephew.

While in the present case no trust was created by the express terms of the will, Edgar, upon the death of the testatrix, became in law trustee of the estate and held it in trust for the life support of his father and mother.   The trust was impressed upon the property by the terms of the devise.

No question has been made but that the orator's proper remedy is by a bill to foreclose Edgar of his life estate in the

farm on account of his failure to perform the conditions of the trust. It is the proper remedy.

There was no breach of the condition in the will by Edgar until January, 1901, when he notified his father that he had no right upon the farm and threatened "to sue him out." From January 17, 1901, when the orator went to Wisconsin, to August 2, 1901, when the trial before the master began, eighty-eight and three-sevenths weeks, the orator supported himself, and his support at three dollars a week, amounted to $265.28, for which and interest thereon his administrator is entitled to a decree; also three dollars a week from August 2, 1901, till the orator's death with interest upon that sum.

The defendant cannot offset the amount of his promissory note, nor the $19.22, balance due upon his judgment against the orator, for the reason that he became bound, by accepting the bequest, to support his father and mother during their lives, and any indebtedness from his father to him could not relieve him from that obligation.

There is no occasion to consider the subject of the defendant's waste, for the orator had no claim upon the farm other than for support, which was provided him down to January, 1901, and the orator died after the hearing before the master.

*The pro forma decree is affirmed so far as it relates to the reforming and construing of said quit claim deeds, but is reversed in respect to the sum due the orator. The cause is remanded with mandate that the court of chancery enter a decree for the orator's administrator for $265.28 and interest thereon since August 2, 1901, to be computed by the clerk, who will also compute the amount due the orator for his support from August 2, 1901, until his death, at three dollars per week, which sums shall be paid by the defendant*

*Edgar within a time to be fixed by the court of chancery,*
*in default of which payment he and Maude Hoyt, his wife and*
*the other defendants shall be foreclosed and forever barred*
*of all right, title and all interest in said farm.*